<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KENNETH G. GERAGHTY,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| | : **Civil Case No. 08-1203 (FSH)** |
| **v.** | : |
| | : <u>OPINION</u> |
| **INSURANCE SERVICES OFFICE, INC., and** | : |
| **FRANK J. COYNE,** | : **Date: April 15, 2009** |
| | : |
| **Defendants.** | : |
| | : |

<u>**HOCHBERG, District Judge**</u>:

This matter comes before the Court upon Defendants' Motion to Dismiss the First Claim for Relief of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). This Court has reviewed the submissions of the parties following oral argument on March 4, 2009.

**I.      BACKGROUND**

This action arises out of Plaintiff Kenneth G. Geraghty's ("Geraghty") alleged whistle-blowing activities. The Amended Complaint asserts five causes of action based on Defendants Insurance Services Office, Inc. ("ISO") and ISO President and CEO Frank J. Coyne's ("Coyne") purported retaliation against Geraghty for disclosing violations of the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"), and threatening to commence litigation against executives of ISO's client companies and former ISO employees.

Geraghty alleges the following facts, which are taken as true for purposes of this Motion: Geraghty was the Chief Financial Officer ("CFO") of ISO from 2000 until his termination on

1

March 8, 2007.  In December 2003, Geraghty joined Gordon Stewart and Robert Vagley as named fiduciaries (the "Named Fiduciaries") for a multiple employer pension plan (the "Plan"), of which ISO was the largest participating employer.  In December 2004, Geraghty and Stewart raised concerns regarding potential conflicts of interest between Vagley's positions as sole director of The Benefits Connection Group Inc. ("BCG"), the company administering the Plan, as President of the American Insurance Association ("AIA"), BCG's parent company, and his role as Named Fiduciary of the Plan.  Stewart and Geraghty also suspected Vagley and BCG of overcharging the Plan for administrative fees.

Stewart and Geraghty began investigating these issues.  By May 2005, the Department of Labor had begun its own investigation of the Plan at the behest of the Named Fiduciaries. Vagley resigned his corporate positions the following month and his position as a Named Fiduciary in December 2005.  In July 2006, the Named Fiduciaries, including Geraghty, filed an action, *Geraghty v. Vagley, et al.*, 06-CV-5725 (S.D.N.Y.), against BCG and Vagley alleging that BCG, Vagley, and others had devised and implemented a scheme to charge the Plan excessive administrative fees in violation of ERISA (the "*Vagley* action").

In February 2007, counsel for the Named Fiduciaries requested that ISO produce documents from the files of certain former ISO executives; Geraghty alleges that "this request for documents concerned ISO because it emphasized the potential liability of its former executives." Am. Compl. ¶¶ 25, 27.  On March 2, 2007, the Named Fiduciaries, through counsel, sent a letter to the court in the *Vagley* action noting the possibility that the Named Fiduciaries would be filing an amended complaint and "implying that such complaint would name additional parties."  *Id.* ¶ 28.  According to Geraghty, "[b]y this time, it was no secret . . . that Geraghty and the Named

2

Fiduciaries were considering adding as defendants additional parties . . . including the AIA,

several former employees of the AIA and BCG . . . and ISO's former executives." *Id.* ¶ 29.  In

addition, Geraghty and the Named Fiduciaries were "assisting the [Department of Labor's]

investigation with respect to the high level executives of ISO's largest customers and ISO's

former employees."  Geraghty Decl. ¶ 3.

On March 8, 2007, Coyne terminated Geraghty's employment with ISO.  Geraghty claims

that the termination was motivated by Coyne's desire to retaliate against him for pursuing the

above-described *Vagley* action, and for cooperating with the Department of Labor's

investigation.  Am. Compl. ¶ 32.

Geraghty also alleges that following his termination, ISO took further actions against him

that were "designed to punish Geraghty and cause him additional harm."[1]  *Id*. ¶ 39.  At the

conclusion of a settlement conference with this Court, Geraghty's claims for the alleged

retaliatory acts that arose after the date on which Geraghty executed a broad release were settled.

Thus, this Opinion will not address the arguments related to those claims.

Defendants have moved to dismiss the remainder of Geraghty's CEPA claim pursuant to

Rule 12(b)(6).  The following facts are drawn largely from Geraghty's own court papers, and are

taken as true by both sides:  Upon being fired, Geraghty retained legal counsel, Brian S. Cousin,

---

[1]  These actions included Defendants' (i) failure to offer Geraghty outplacement services;
(ii) the constructive termination of another ISO employee's assistance to Geraghty in his role as
the Chairman of the Named Fiduciaries; (iii) the removal of language protecting Geraghty under
ISO's fiduciary Insurance Policy; (iv) the early and costly redemption by only three days of 3,653
ISO shares held by Geraghty; (v) the denial of Geraghty's request to impose a share trading
blackout and conduct a special mid-quarter share price valuation in response to an extraordinary
event; (vi) the denial of Geraghty's request to review minutes of ISO's ESOP Committee
meetings; and (vii) the improper withholding of New Jersey State income taxes.

Esq., to negotiate a separation package with ISO.  Cousin was the head of his firm's New York/New Jersey employment law practice, possessing "extensive experience advising . . . executives in all aspects of employment law, including drafting and negotiating employment and separation agreements."[2]

In the six weeks following Geraghty's termination, Geraghty had the benefit of Cousin's skillful advice and counsel, culminating in Cousin negotiating a separation package with ISO's General Counsel.  On April 27, 2007, Geraghty executed a document entitled "Agreement and General Release" (the "Release").  The Release contains a "General Release of Claims" that states:

> Employee knowingly and voluntarily releases and forever discharges, to the full extent permitted by law, ISO, it affiliates, subsidiaries, divisions, predecessors, successors and assigns and the current and former employees, officers, directors and agents thereof (collectively referred to throughout the remainder of this Agreement as 'Employer'), of and from any and all claims, known and unknown, asserted and unasserted, Employee has or may have against Employer as of the date of execution of this Agreement and General Release, including but not limited to, any alleged violation of: [list of thirteen federal and state statutes, not including CEPA, and] [a]ny other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance . . . .

As consideration for signing the Release, ISO paid Geraghty approximately $250,000.[3]

The Release includes acknowledgments from Geraghty that "he has had greater than twenty-one (21) calendar days to review this Agreement and General Release and has consulted with an

---

[2]  Biography of Brian S. Cousin *available at* www.seyfarth.com.

[3]  Both parties agree that Geraghty was a highly paid executive, with a sophisticated education and more than ample means.  In addition to the severance pay of $250,000, Geraghty had large financial resources:  a combination of reinvested ISO income plus granted stock options, plus an intra-corporate loan from ISO, augmented by the investment of personal savings and stock appreciation, yielded approximately $49 million to Geraghty as the value of his stock options as of the date of his termination.

attorney prior to execution of this Agreement and General Release."  The Release also provided

Geraghty seven days following execution to revoke the Release.  More than seven days later,

Geraghty sent a signed letter to ISO's director of human resources reaffirming that: "On April 27,

2007, I executed an Agreement and General Release between ISO and me.  I consulted with an

attorney of my choosing, prior to executing this Agreement and General Release."  Above

Geraghty's signature, the Release also states: "Having elected to execute this Agreement and

General Release, to fulfill the promises and to receive the sums and benefits in paragraph '2'

above, Employee freely and knowingly, and after due consideration, enters into this Agreement

and General Release intending to waive, settle and release all claims he has or might have against

Employer."

     Geraghty's court filings concede that before signing the Release, he specifically discussed

with his attorney the effect of the Release on his potential CEPA claims.  Indeed, Geraghty states

in his Declaration that:

> Prior to my executing the General Release, my counsel identified for me the Defendants'
> failure to specifically reference CEPA by name in the General Release and explained to
> me that, under New Jersey law,[4] that failure might enable me to bring a CEPA action at a
> future time.

Geraghty Decl. ¶ 4.  As a matter of apparent legal strategy, neither Geraghty nor his attorney

mentioned to the other side during the lengthy severance negotiations that Geraghty wished to

exclude CEPA claims from the coverage of the Release, notwithstanding the terms of the Release

that broadly covered "any and all claims . . . [Geraghty] has or may have against [ISO] as of the

date of execution of this [Release] . . . including, but not limited to, any alleged violation of . . .

---

[4] This is an apparent reference to *Keelan v. Bell Commc'ns Research*, 289 N.J. Super.
531 (App. Div. 1996).

any other local, state or federal law."

Defendants move to dismiss Geraghty's CEPA claims that were known, or with the exercise of reasonable diligence could have been known, prior to the execution of the Release. The issue presented is thus a question of law: is the CEPA claim based on Geraghty's termination a claim he "had or may have" had for an "alleged violation of . . . any other . . . state law"?

## II.   STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).  According to the Third Circuit, "stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (internal quotations omitted) (citing *Twombly*, 127 S. Ct. at 1965).

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court may consider the Complaint, exhibits attached to the Complaint, matters of public record, and undisputably authentic documents if the plaintiff's claims are based on those documents. *Pension Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1992).[5]

_____

[5] To the extent the Court considers facts proffered by Geraghty in his briefs and accompanying Declaration, and revealed at oral argument to be undisputed, the motion to dismiss is converted into a motion for summary judgment on those limited factual issues.  Fed. R. Civ. P.

III.    DISCUSSION

        In order to proceed with his CEPA claim for allegedly retaliatory acts occurring prior to

the execution of the Release, Geraghty must plead enough facts to raise a reasonable expectation

that discovery will reveal that either his execution of the Release was not knowing or voluntary,

or that the scope of the Release does not cover CEPA claims as a matter of law.

        "In New Jersey, a signed release carries considerable weight."  *Cooper v. Borough of

Wenonah*, 977 F. Supp. 305, 311 (D.N.J. 1997).  Employment claims, like Geraghty's, may be

waived through a general release when the waiver is made "knowingly and willfully."  *Coventry

v. U.S. Steel Corp.*, 856 F.2d 514, 522 (3d Cir. 1988); *see also Bowersox Truck Sales & Serv.

Inc. v. Harco Nat'l Ins. Co.*, 209 F.3d 273, 279 (3d Cir. 2000) (release covers such matters as can

fairly be said to have been within the contemplation of the parties when the release was signed).

Here, the parties agree they entered into the Release as of April 27, 2007, and agree on the text of

that Release.  What they disagree about is the legal scope of the Release.

        There is no genuine question as to whether Geraghty signed the Release knowingly and

voluntarily.  Geraghty had a highly sophisticated education[6] and top executive business

experience;[7] he had a long period of time in possession of and access to the agreement before

---

12(d); *see also Weinberg v. Interep Corp.*, No. 05-5458, 2006 WL 1096908, at *2, 4 (D.N.J. Apr.
26, 2006) (converting defendants' 12(b)(6) motion into one for summary judgment, and granting
same because plain language of release agreement barred plaintiff's NJLAD discrimination
claims).

        [6]  Geraghty earned his bachelor's degree from Columbia University, his master's degree
from the University of California at Berkeley, and his MBA in Finance from Harvard University.

        [7]  Prior to becoming CFO at ISO, Geraghty was a top executive at other major
corporations.  Geraghty does not allege any facts suggesting that he will, with discovery, be able

signing it;[8] he and his attorney played a large role in negotiating the terms of the agreement;[9] the agreement was clear; Geraghty was represented by and consulted with an attorney highly expert in the field of employment law; and the consideration given in exchange for the waiver exceeded employee benefits to which Geraghty was already entitled by contract or law. *See Keelan v. Bell Commc'ns Research*, 289 N.J. Super. 531, 541 (App. Div. 1996) (citing *Swarts v. The Sherwin-Williams Co.*, 244 N.J. Super. 170, 177 (App. Div. 1990)).

The sole legal issue thus presented is the scope of the Release. Geraghty asserts that it does not release his state law CEPA claim, even though by its plain language it releases "any and all claims . . . including . . . any alleged violation of . . . any other local, state or federal law," because it does not expressly list "CEPA."

New Jersey courts can consider whether "objectively the ordinary employee would know of his rights upon execution of the release." *Keelan*, 289 N.J. Super. at 543 ("Certainly, a release executed by an employee who is unaware of his rights is not a knowing or voluntary release."). Here, Geraghty does not allege that he did not "know of his rights" under CEPA. Rather, Geraghty affirmatively alleges that he had knowledge and legal advice about the existence of his potential CEPA claim: He states in his court filings that before signing the Release (1) he

---

to demonstrate that he was not sufficiently sophisticated to comprehend the language of the Release. *See Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 453 (3d Cir. 1988) (fact that plaintiff was "literate" and "well-educated" weighed in favor of finding release "knowing").

[8] Geraghty does not suggest that 21 days was an insufficient amount of time to review the Release before signing it, and discovery will not change this fact. *See Cirillo*, 862 F.2d at 453 ("one month is a reasonable time for deliberation").

[9] *See Cirillo*, 862 F.2d at 455 n.4 ("the existence of an opportunity to negotiate with respect to a release is a substantial indicia that its execution was knowing and voluntary").

consulted with his attorney; (2) the attorney saw that the Release did not "specifically reference CEPA by name;" and (3) Geraghty discussed with his counsel the legal ramifications under "New Jersey law" of CEPA not being specifically listed in the Release, including whether that "might" enable him to bring a CEPA action in the future.  Geraghty Decl. ¶ 4.  After these strategic consultations with counsel Brian Cousin, Esq., neither Geraghty nor Cousin sought to exclude CEPA from the Release of "any other local, state or federal law."  Instead, Geraghty chose with his attorney to follow the legal strategy to remain mute on the issue of Geraghty's potential CEPA claim and, after collecting $250,000 severance pay, sue for a CEPA violation, arguing that it was not released because CEPA was not expressly listed.[10]

Geraghty affirmatively argues in his own court papers that he did not "knowingly" waive his CEPA rights because he "did not reasonably believe that he was *definitively* releasing [a CEPA] claim," since his attorney had advised him that under "New Jersey law" he "might" be able to bring a CEPA claim at a future date.[11]  Opp. Br. 3 (emphasis added).  This argument is

---

[10]  Because Geraghty and his attorney knew of his potential CEPA claims, if they wished to exclude those potential claims from the Release, it was their obligation to express that intention across the bargaining table; Geraghty cannot now rely upon an unspoken understanding that CEPA was excepted from the Release.  *See Brawer v. Brawer*, 329 N.J. Super. 273, 283 (App. Div. 2000) ("A contracting party is bound by the apparent intention he or she outwardly manifests to the other party.  It is immaterial that he or she has a different, secret intention from that outwardly manifested."); *Leitner v. Braen*, 51 N.J. Super. 31, 38 (App. Div. 1958) ("The phrase, 'meeting of the minds,' can properly mean only the agreement reached by the parties as expressed, *i.e.*, their manifested intention, not one secret or undisclosed, which may be wholly at variance with the former.").

[11]  If Geraghty is alleging that he received erroneous legal advice from his attorney, his remedy is against his attorney, not Defendants.  *See Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 374 (7th Cir. 1989) ("The fact that plaintiff's counsel may have inaccurately conveyed the effect of the release or failed to draft language adequate to protect plaintiff's Title VII rights may be remedied through a malpractice action, but not through judicial interpretation of plaintiff's subjective intent.")

not about whether Geraghty knew what he was signing, but rather that he and his counsel chose a strategy to stay mum about CEPA and deliberately see if they "might" be able later to convince a court to apply *Keelan* to him, after collecting $250,000 severance.  To be unsure whether that legal strategy would prevail at a later date does not remotely constitute an unknowing or involuntary signing of a release.  Indeed, Geraghty affirmatively states in his own factual averral his awareness that he was signing a release with a potential legal question; namely, the scope of the waiver.  Geraghty may not have known "definitively" how a court would later decide that legal question, but he certainly knew exactly what he was signing and what legal strategy he was selecting.  In other words, Geraghty knew a court "might" find that the Release did not waive his CEPA claim; the flip side, though, is that he knew a court "might not."

In sum, Geraghty, with the advice of counsel, knowingly chose to negotiate the Release without excepting CEPA from "any and all claims," and thereby knowingly chose to take his chances on how a later court would determine the legal scope of that Release.  The only genuine issue presented is an issue of law as to whether *Keelan* permits Geraghty to sue for a CEPA violation after signing a broad general release of all state and federal law claims at a time when Geraghty and his counsel knew about his purported whistle-blower claims:  This Court finds that it does not.  *See Cirillo*, 862 F.2d at 454 (waiver of discrimination claim valid where plaintiff's admissions indicated he "fully understood" his right not to be discriminated against).[12]

Finally, as an alternative argument, Geraghty contends that his CEPA claim had not

---

[12]  *See also Williams v. Washington Mut. Bank*, No. 2:07-5559, slip op. (N.J. App. Div. 2008) (finding that arbitration agreement signed by employee applied to employee's CEPA claim despite agreement failing to explicitly name CEPA); *Swarts*, 244 N.J. Super. 170 (holding release valid with respect to employee's claim under NJLAD, even though release did not explicitly mention that statute).

"accrued" at the time he signed the Release, and therefore could not have been waived.  *See* Opp.

Br. 2, 15-17.  In support of this argument, Geraghty references the "continuing violation

doctrine," and cites cases that hold that CEPA's one-year statute of limitations begins to run from

the final act of retaliation where there is a pattern of retaliatory conduct.  *E.g. Green v. Jersey*

*City Bd. of Educ.*, 177 N.J. 434, 446-48 (2003).  These cases are inapposite because the

timeliness of Geraghty's CEPA claim is not the issue here.  Rather, the proper focus is whether

Geraghty was aware of his rights under CEPA at the time he executed the Release.

As discussed above, Geraghty affirmatively avers in his court papers that before signing

the Release, he knew of the overwhelming majority of facts giving rise his CEPA claim; to wit

his contention that he was fired after he "threaten[ed] . . . to add the high level executives of

ISO's largest customers as defendants" in the *Vagley* action, "threaten[ed] to add ISO's former

employees . . . as defendants" in that same case, and "assist[ed] the [Department of Labor's]

investigation with respect to the high level executives of ISO's largest customers and ISO's

former employees."[13]  Geraghty Decl. ¶ 3.  The additional claimed retaliatory acts that allegedly

occurred several months to a year after his termination and after he signed the Release are

exceedingly minor in comparison, and were not necessary to ripen his main CEPA claim of

whistle-blower termination.

While the Court indicated its intention to let those relatively minor post-Release CEPA

---

[13] To the extent that Geraghty now argues that he did not know that Defendants had terminated his employment in retaliation for his whistle-blowing activities, this contention is directly contrary to allegations in the Amended Complaint and statements in his Declaration.  *See* Am. Compl. ¶¶ 22-29 (listing alleged whistle-blowing acts that occurred before Geraghty signed the Release); Geraghty Decl. ¶ 4 (stating that Geraghty discussed CEPA – an anti-retaliation statute – with his attorney before executing the Release).

claims proceed, those claims were settled, and thus that portion of this Opinion that held in favor of Geraghty is now moot**.**

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss the First Claim for Relief in part, with respect to alleged retaliatory actions that occurred prior to the execution of the Release, including, but not limited to, Geraghty's termination of employment. An appropriate order will issue.

**/s/ Faith S. Hochberg**

Hon. Faith S. Hochberg, U.S.D.J.

12